# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7482 | **DATE** | 11/6/2000 |
| **CASE TITLE** | DANIS vs. USN COMMUNICATIONS, INC., et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The motion for summary judgement [273-1] is granted. Judgment is entered for defendant Deloitte & Touch LLP and against the plaintiff class. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | NOV 13 2000 | 352 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 00 NOV -9 PM 6:55 | 11/6/2000 | |
| SB | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | jad | |
| | | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

**NOV 1 3 2000**

|  |  |  |
|---|---|---|
| DANIS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 98 C 7482 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| USN COMMUNICATIONS, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs bring this class action on behalf of all persons and entities who (1) purchased USN Communications, Inc. ("USN") common stock in the open market pursuant to the registration statement and prospectus or purchased stock during the period February 4, 1998 through November 20 1998 ("class period"), and (2) were damaged by defendants' violations of the federal securities laws. Consolidated Class Action Complaint ("Cmplt.") ¶ 1. Plaintiffs name Deloitte & Touche LLP ("Deloitte") as one of the defendants.[1] Plaintiffs allege that Deloitte violated Section 11 of the Securities Act of 1933 ("§11") by certifying materially false statements in USN's prospectus (Count I). Plaintiffs further allege that Deloitte violated Section 10(b) and Rule 10(b)(5) of the Securities Exchange Act of 1934 ("Rule 10(b)(5)") by intentionally or recklessly deceiving stock investors and artificially inflating the price of USN stock (Count III).[2]

---

[1] The case has been settled as to all co-defendants.

[2] The remaining claims against all other defendants have been dismissed or settled.

# BACKGROUND

## I. USN

All facts are undisputed unless otherwise noted. USN was a reseller of telecommunication services. Def. App. Ex. 28 at 4.[3] The company purchased various local and long distance telecommunication services from Regional Bell Operating Companies ("RBOCs"), such as Ameritech, bundled the services, and sold the package. *Id.* USN employees contacted RBOC customers and offered them lower rates for switching to USN's services. *Id.* If the solicitation was successful, USN provisioned the former RBOC customer over to USN. *Id.*

In February 1998, USN offered its stock to the public ("the IPO"). *Id.* at 1. The prospectus issued in connection with the IPO contained a 1996 audit report. Pl. 56.1(b)(3)(A) at ¶ 65.[4] The prospectus included September 30, 1997 interim financial statements. *Id.* at ¶ 74. These interim statements were prepared by USN management and were marked as unaudited in the prospectus. *Id.* at ¶¶ 75-76.

USN's rapid growth prior to the IPO caused functional problems with the company's billing system. Def. App. Ex. 28 at 34. The system did not correctly account for all customer charges. *Id.* As a result, accurate billing of USN clients was delayed. *Id.* USN's prospectus disclosed warnings about USN's operations and financial standing, many of which were found in a 10-page section of risk factors. These warnings include:

> The accurate and prompt billing of the Company's customers is essential to the Company's operations and future profitability . . . Indeed, the company had already

---

[3]"Def. App." and "Pl. App." refer to the parties' appendices of exhibits.

[4]"Pl. 56.1(b)(3)(A)" refers to plaintiffs' response to Deloitte's Local Rule 56.1(a)(3) statement of uncontested facts.

experienced substantial delays in accurately and timely billing its customers. *Id.* at 13, 34.

[USN] has modified and will continue to modify its billing and customer care systems . . . [h]owever, there can be no assurance that such systems will be adequate to manage the Company's anticipated expansion . . . the failure by the Company to implement other alternatives . . . or implement adequate revenue assurance programs could have a material adverse effect on the Company's financial condition and results of operations. *Id.* at 13, 19.

The Company expects to realize additional operating losses on a consolidated basis while it continues to expand and develop its service offerings and its customer base. There can be no assurance that the Company will be able to develop or expand its customer base or that it will achieve profitability in future years . . . There can be no assurance that the Company will be able to achieve or sustain positive cash flow from operating activities or to implement its growth strategy. *Id.* at 12.

No assurance can be given that the Company will be able to manage its expanding operations and, if the Company's management is unable to manage growth effectively, the Company's financial condition and results of operations could be materially adversely affected. *Id.* at 19.

USN's stock price may be affected due to "delays by the Company in achieving its expansion goals, fluctuations in the Company's operating results, . . . changes in earnings estimates of securities analysts . . . *Id.* at 20.

Ten months after USN offered its stock to the public, its value declined from the IPO price of $16 per share to under $.50 per share. *Id.* at 47, 67-68. On February 18, 1999, USN filed for bankruptcy under Chapter 11. *Id.* at 69.

## II. Deloitte

Deloitte conducted audits of USN's financial statements from 1994 through 1997. Deloitte 56.1(a)(3) at 10-11. Deloitte consented to the 1996 audit report's inclusion in USN's prospectus. *Id.* at 49-50. Jerry Cohen was the partner in charge of USN's audits. *Id.* at 11. In addition to leading the audits, he reviewed USN's quarterly financial statements, issued the consents in regard to USN's prospectus, and performed consulting services and revenue assurance work for the company. *Id.* As

a result of the work Deloitte performed for USN, Deloitte knew about USN's customer billing problems and its problems with internal controls. *Id.* at 22. After performing its audits, Deloitte accurately assured plaintiffs that USN would remain in business at least until December 31, 1998. *Id.* at 43.

## III. Claims against Deloitte

Plaintiffs' claims against Deloitte are all based on the same set of allegations. Plaintiffs contend that USN's 1996, 1997 and 1998 financial statements contain material misrepresentations. Specifically, they contend that (1) USN's practice of billing *former* customers for monthly recurring charges caused USN's revenue, accounts receivable, and assets to be overstated, and (2) USN's untimely, inaccurate billing system caused many bills to be uncollectible, and thus contributed to material overstatement of the company's accounts receivable. Pl. 56.1(b)(3)(B) at ¶¶ 29, 55.[5]

## DISCUSSION

## I  Summary judgment standard

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>King v. National Human Resource Committee, Inc.</u>, 218 F.3d 719, 723 (7th Cir. 2000). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56 (e); <u>Silk v. City of Chicago</u>, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the

---

[5]"Pl. 56.1(b)(3)(B) refers to plaintiffs' statement of additional facts requiring denial of Deloitte's motion for summary judgment.

party opposing the motion. <u>Bay v. Cassens Transport Co.</u>, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Insolia v. Philip Morris, Inc.</u>, 216 F.3d 596, 599 (7th Cir. 2000).

## II    Section 11 claim

Section 11 liability is triggered when (1) a prospectus contains false facts or misleading omissions; (2) the misrepresentations are material; and (3) the facts suggest preparation or certification by the defendant. 15 U.S.C. § 77k(a). In determining whether misrepresentations are material for purposes of summary judgment, the court must make a careful evaluation of the inferences a reasonable shareholder would draw if all the facts had been presented accurately. <u>Endo v. Albertine</u>, 863 F. Supp. 708, 717 (N.D. Ill. 1994), <u>aff'd sub nom.</u>, <u>Endo v. Arthur Andersen & Co.</u>, 163 F.3d 463, 464 (7th Cir. 1999). The issue of materiality may only be resolved as a matter of law if reasonable minds cannot disagree as to whether the allegedly misrepresented facts would have been important to an investor. <u>Id.</u> The information is deemed important to an investor if there is a substantial probability that "the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Id.</u> (citing <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988)).

Auditors are liable for § 11 violations unless they establish a due diligence defense. <u>Id.</u> at 727. To successfully defend their actions, auditors must show that they undertook "that investigation which a reasonably prudent man in that position would conduct." <u>Id.</u> at 728. Reasonableness may be resolved as a matter of law if the facts are undisputed and could not create a reasonable difference of opinion. <u>West v. State Farm Fire & Casualty Co.</u>, 868 F. 2d 348, 350 (9th Cir. 1989).

## A. Deloitte's liability under § 11

### 1. 1996 audit report

Plaintiffs claim that Deloitte's 1996 audit report, which USN included in its 1998 prospectus, violated § 11. Plaintiffs argue that there were material misrepresentations in the report. Specifically, plaintiffs assert that Deloitte misrepresented the facts when it certified (1) Deloitte conducted its audits in accordance with Generally Accepted Auditing Standards ("GAAS"); (2) the consolidated financial statements "present fairly in all material respects," the financial position of the Company . . ." and (3) the financial statements are in accordance with Generally Accepted Accounting Principles ("GAAP"). Def. App. Ex. 28 at F-8.

Plaintiffs have not presented evidence of material misrepresentations in the 1996 financial statements or audit report. On August 24, 2000, plaintiffs' expert, Robert Berliner, testified that he was not of the opinion that the 1996 financial statements in the prospectus were materially misstated. *Id.*, Ex. 3 at 88. He confirmed that he had no intention of testifying about the 1996 financial statements at trial. Berliner Aff. at 5. Berliner's expert report, dated July 7, 2000, supports his deposition testimony. Although Berliner's report concludes that the unaudited financial statements and the 1997 financial statements were materially misstated, the report does not contain an opinion that the 1996 financial statements were materially misstated. *Id.*, Ex. 19.

On September 17, 2000, over two months after Berliner's report was provided to defense counsel pursuant to Rule 26(a)(2), Fed. R. Civ. P., and after Deloitte provided plaintiffs with a copy of its summary judgment motion, Berliner submitted an affidavit with a new approach contradicting his prior testimony. In the affidavit, Berliner attests, "I have changed my opinion that the 1996

Financial Statements taken as a whole were not materially misstated. I will not have an opinion until I am able to make the assessment described above." Berliner Aff. at 7. Although it is convenient for plaintiffs that Berliner changed his mind in a way that challenges the arguments in Deloitte's motion for summary judgment, this court will not consider his affidavit for several reasons.

Berliner's affidavit does not conform with the requirements of Rule 56(e), Fed. R. Civ. P.[6] Berliner's affidavit goes beyond professional opinion and includes inadmissible advocacy and hearsay. Berliner refers to arguments that Deloitte made in its summary judgment motion and then responds to these arguments. Berliner Aff. at 8, 10. Furthermore, he offers inadmissible information to explain why he failed to review certain documents earlier. He explicitly states that plaintiffs' counsel told him the documents recently were recovered from Spectrum, USN's billing agent. Berliner Aff. at 5. This is pure hearsay and does not belong in an affidavit.

In addition, Berliner's affidavit directly contradicts his deposition testimony. He testified that the 1996 financial statements were not materially misstated. In his subsequent affidavit, he stated the financial statements "might" be materially misstated. When a subsequent affidavit contradicts earlier deposition testimony, courts rely on the deposition testimony because it is considered the more credible evidence. As the Supreme Court recently noted, "A party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Policy

---

[6]Deloitte did not move to strike Berliner's affidavit under 56(e), but Deloitte addressed the inadequacy of Berliner's affidavit in its reply brief. Def. Reply at 3-4. Even if objections are waived, a court is not required to consider affidavits that fail to conform to 56(e) requirements. Friedel v. City of Madison, 832 F.2d 965, 970 (7th Cir. 1987).

Management Systems, Corp., 526 U.S. 795 (1999); Bank of Illinois v. Allied Signal Safety Restraint Systems, 75 F.3d 1162, 1168 (7th Cir. 1996) ("We have long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions"). See also Darnell v. Target Stores, 16 F.3d 174, 176 (7th Cir. 1994); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993); In Miller v. A.H. Robins Co., Inc., 766 F.2d 1102, 1105 (7th Cir. 1985).

Berliner's attempt to resolve the disparity between his deposition and untimely affidavit is unpersuasive. He stated in his affidavit that he did not have access to certain documents from Spectrum, USN's billing agent, prior to his deposition. He claims these documents shed additional light on USN's 1996 financial standing. Berliner Aff. at 5. However, at a hearing in September, a Spectrum representative testified that he sent these documents to plaintiffs' counsel on July 18, 2000. Report and Recommendation of Magistrate Judge Schenkier dated October 20, 2000. This means that plaintiffs had the documents for more than a month before Berliner was deposed. The only possible gaps in this information were for the months October through December 1997 and February 1998. Id. at 46-47. This information is irrelevant to Berliner's analysis of the 1996 financial report. Thus, Berliner did not give a sufficient justification for contradicting his deposition testimony.

Nor may this court consider Berliner's affidavit for procedural reasons. The expert discovery deadline was August 25, 2000. Without requesting an extension of the discovery schedule, plaintiffs' counsel filed this affidavit almost a month after the deadline. In order to prevent prejudice to opposing parties and waste of judicial resources, courts may prohibit experts from offering new opinions after the expert discovery deadline. Salgado v. General Motors Corp., 150 F.3d 735, 740-42 (7th Cir. 1998). See also Baker v. Indian Prairie Community Unit School District No. 204, No. 96 C 3927,

1999 WL 988799, at *2 (N.D. Ill. Oct. 27, 1999) ("Deadlines play an important role in the Court's ability to manage and control its docket, and the Court has the ability to establish and enforce its deadlines").

If this court considered Berliner's affidavit, it would be highly prejudicial to Deloitte. Each party must complete discovery in time to permit the opposing party to meet its discovery needs "before the carefully-established close-of-discovery date." Smith v. Union Pacific Railroad Co., 168 F.R.D. 626, 629 (N.D. Ill. 1996). Deloitte relied on the accuracy of the evidence obtained during discovery. Allowing plaintiffs to submit Berliner's contradictory affidavit after discovery ended would effectively preclude Deloitte from questioning Berliner on his tentative new conclusions, responding to his statements in their briefs, and deposing other witnesses that might have been called in response to Berliner's new conclusions. This is exactly the type of prejudice that discovery deadlines were designed to avoid.

Even if Berliner's new testimony were considered, the testimony would not create a genuine issue of material fact. Berliner does not claim there were material misstatements in the 1996 financial information, but rather that he "might" be able to offer this opinion at a later unspecified date. Moreover, Berliner does not even attempt to quantify the amount of misstatements in the 1996 report.[7] Accordingly, the evidence offered in Berliner's affidavit does not enable plaintiffs to withstand a summary judgment motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (summary judgment will be granted "after adequate time for discovery . . . against a party who fails to make a

---

[7]Plaintiffs have recently filed a motion to supplement Berliner's expert report to include newly determined estimates of the degree to which USN's 1997 financial statements were misstated. Even at this late date, they have not attempted to offer an opinion by Berliner that the 1996 financial statements were materially misstated.

showing sufficient to establish the existence of an element essential to that party's case . . ."). A motion for summary judgment requires the nonmovant to produce actual evidence, not vague claims of possible future evidence.

There is no justification for the substantive inadequacies of Berliner's affidavit. "Expert reports must not be sketchy, vague, or preliminary in nature." Fed. R. Civ. P. 26 Advisory Committee's note. The evidence offered in Berliner's affidavit regarding USN's 1996 financial statements is undoubtedly sketchy, vague, and preliminary. Furthermore, disclosures cannot be used strategically as a way to extend the discovery deadline. Salgado, 150 F.3d at 742 (citations omitted). Berliner has essentially tried to extend the discovery period with his tentative affidavit. In the interests of fairness to Deloitte and judicial efficiency, this court cannot allow such a tactic.

Plaintiffs advance evidence that as early as 1995, USN established a practice of billing customers for monthly recurring charges after those customers had left USN. Doyle Dep. at 79. This practice might have caused USN's 1996 revenue estimates to be inflated. Id. at 69-73. However, plaintiffs have failed to offer any evidence that the alleged revenue inflation was material. Without any evidence as to the degree of alleged inflation, a trier of fact could not conclude that a reasonable investor's decisions would be affected by this information.[8] Thus, this evidence is also insufficient for plaintiffs to withstand summary judgment.

---

[8]Even Berliner's recently updated and untimely affidavit simply stated that USN's billing problems "had less of an impact on USN's 1996 financial statements than on its 1997-1998 financial statements." Berliner Aff. at 9.

The remaining evidence plaintiffs have produced of material misstatements in the financial data pertains to 1997 or 1998.[9] The 1997 audit report was not included in the prospectus.[10] Thus, it is not a basis for Section 11 liability.

Plaintiffs fail to present evidence to support their claims of material misrepresentations in regard to Deloitte's GAAP and GAAS certification. Violations of GAAP and GAAS standards are established through expert testimony. Wikoff v. Vanderveld, 897 F.2d 232, 235 (7th Cir. 1990). See also In re Discovery Zone Securities Litigation, 943 F.Supp. 924, 935 (N.D. Ill. 1996) (rev'd on other grounds) (disputes over whether GAAP were violated are best resolved by expert testimony). Plaintiffs' experts do not provide any evidence of material GAAP or GAAS violations. Berliner

_____

[9]Plaintiffs offer the following evidence: (1) Prospectus omitted the fact that the last 3 months of USN bills were not rendered in a timely and accurate manner. Pl. App. Ex. 74 at 138-140; (2) USN billing systems did not accurately account for all customer charges in 1997 and 1998, and billing problems arose from the physical processing at Spectrum and the database processing at USN. Id. Ex. 5 at 89; Pl. App. Ex. 3 at 140; Id. Ex. 57 at 241-243; Id. Ex. 12 at 53-54, 60-61; Ex. 46 at 21; Id. Ex. 13 at 57; (3) billing problems had an adverse effect on USN's cash flow as of February, 1998. Id. Ex. 15 at 456-57; (4) 1998 financial statements were misstated by at least $4-5 million. Id. at 505-08; (5) Deloitte knew as of 1997 that the number of access lines sold or provisioned was inflated due to failure to deduct customers who discontinued service. Id. Ex. 6 at 69,72-74; (6) prospectus falsely claimed that USN developed an electronic provisioning system. Pl. Resp. to Elliott and Sweas 56.1(a)(3) at 196; (7) Deloitte's 1997 audit notes showed that a high percentage of tested accounts were "obvious bad debts." Cohen Ex. at 2; (8) Deloitte knew that many USN bills were passed due as of March 1998. Id. at 7, 19; (9) Deloitte's 1997 audit recognized that the reduction in revenue for customer accommodation credit was based on an incomplete customer list. Id. at 19; and (10) Deloitte conducted a sensitivity study to determine whether a going concern paragraph should be included in its 1997 audit, and this study constituted an extreme departure from the standards of ordinary care. Pl. App. Ex. 76 at 12-1 to 12-6.

[10]This court granted Deloitte's motion to strike the report of plaintiffs' expert witness, Patricia Gleitsmann, and precluded her from testifying at trial because her report failed to comply with Rule 26(a)(2)(B) disclosure requirements. Gleitsmann's testimony would not provide evidence to withstand summary judgment. Her report did not contain an opinion that the 1996 audit report was materially false or misleading. Def. App. Ex. 22. When Gleitsmann later testified in deposition, she confirmed the absence of such an opinion in the report and stated that she had no intention of testifying differently at trial. Id. Ex. 6 at 113.

testified at his deposition that although there were violations of GAAP in 1996, he was not of the opinion that the 1996 financial statements were materially misstated as a result of the GAAP violations. Def. App. Ex. 3 at 88. As discussed above, his report does not contain an opinion that the 1996 financial statements were materially misstated. *Id.* Ex. 19. If the financial statements were not materially misstated as a result of alleged GAAP violations, Deloitte's assurance of compliance with GAAP was not materially misleading. Plaintiffs offer no other evidence of violations of GAAP or GAAS. Accordingly, there is no reasonable basis for a jury to find that the 1996 audit report violated § 11.

### 2. Inclusion of the 1996 report in the prospectus

Plaintiffs argue that Deloitte is liable under § 11 because the accounting firm approved inclusion of the 1996 audit report in USN's prospectus. Plaintiffs claim Deloitte should not have given its approval because it knew the prospectus contained unaudited 1997 financial information that was inaccurate. This claim fails as a matter of law. Unless auditors actually make misstatements or certify that misstatements are accurate, they are not liable under § 11. Endo 863 F. Supp. at 731. Deloitte did not make or certify any inaccurate statements in the unaudited 1997 financial information. Accordingly, Deloitte's motion for summary judgment on the § 11 claim must be granted.

### III. Rule 10(b) claim

In order to establish a Rule 10(b)(5) violation, plaintiffs must prove: (1) Deloitte made or certified false statements or omissions; (2) the misrepresentations were material; (3) Deloitte acted with scienter; (4) the misrepresentations were made in connection with the purchase or sale of a security; (5) plaintiffs relied upon the misrepresentations; and (6) the reliance caused damage to the

plaintiffs. Snap-On Inc. v. Oritz and SPX, No. 96 C 2138, 1999 WL 592194 (N.D. Ill. Aug. 3, 1999). See also Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 494 (7th Cir. 1986).

In order to prove scienter, plaintiffs must establish that Deloitte acted with an intent to deceive or with recklessness Barker, 797 F.2d at 495 (citing Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1040 (7th Cir. 1977)). Courts should be reluctant to grant summary judgment when intent is at issue. McCoy v. WGN Continental Broad Co., 957 F.2d 368, 371 (7th Cir. 1992). However, plaintiffs must present some evidence of Deloitte's intent in order to survive a summary judgment motion. Alra Laboratories, Inc. v. American Cyanamid Co., No. 92 C 2252, 1999 WL 160710, at *8 (N.D. Ill. March 11, 1999). See also Renovitch v. Kaufman, 905 F.2d 1040, 1046 (7th Cir. 1990) (affirming dismissal of a Rule 10b-5 claim where plaintiffs did not offer material facts sufficient to establish scienter).

**A. Deloitte's liability under Rule 10(b)(5)**

**1. 1996 report**

With respect to the 1996 audit report, the Rule 10(b)(5) claim against Deloitte requires no further consideration.[11] As discussed above, plaintiffs have failed to present evidence of material misrepresentations in the 1996 report. If plaintiffs cannot prove a § 11 violation, they certainly cannot prove a Rule 10(b)(5) violation, which requires more evidence of culpability. Endo, 163 F.3d at 464.

**2. 1997 unaudited financial information**

Plaintiffs cannot establish that Deloitte violated Rule 10(b)(5) by examining USN's 1997 unaudited financial report. Aiding and abetting fraud is not sufficient for Rule 10(b)(5) liability.

---

[11]The reasons for finding that plaintiffs have not produced sufficient evidence for Rule 10(b)(5)'s scienter element with respect to the 1997 audit report also apply to the 1996 report.

<u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 191 (1994). To be liable under Rule 10(b)(5), Deloitte must have actually made the material misrepresentations or engaged in manipulative behavior. Manipulative behavior refers to "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 199 (1976). Mere negligence is not enough. <u>Id.</u> at 214. Deloitte did not make any representations in the unaudited reports. It simply reviewed them. Furthermore, as discussed in greater detail below, plaintiffs have not presented evidence to support a reasonable inference that in Deloitte's review of this information, it somehow intended to control or artificially affect the price of securities.

### 3. 1997 audit report

With respect to Deloitte's 1997 audit report, plaintiffs have failed to present evidence to support a reasonable inference of scienter on the part of Deloitte, a requirement for proving a Rule 10(b)(5) claim. Indeed, plaintiffs have failed to produce any evidence that Deloitte intended to deceive them or acted recklessly.

***Intent to deceive***

In order to establish intentional deception, a plaintiff must do more than show that the defendant had knowledge of the undisclosed facts. <u>Schlifke v. Seafirst Corp.</u>, 866 F.2d 935, 946 (7th Cir. 1989) (citations omitted). The plaintiff must also show that the danger of misleading buyers was "actually known or so obvious that any reasonable man would be legally bound as knowing." <u>Id.</u> Recklessness must be so extreme that intent can be inferred. <u>Searls v. Glasser</u>, 64 F. 3d 1061, 1066 (7th Cir. 1995).

Plaintiffs offer no evidence that Deloitte knew of inaccuracies in the 1997 financial statements that could actually mislead plaintiffs. Plaintiffs argue that scienter can be inferred because Deloitte learned through its consulting services and other non-audit work that USN "(i) was improperly recognizing revenue; (ii) did not possess the electronic provisioning interface systems discussed in the Registration Statement/Prospectus; (iii) did not possess the billing systems or billing capabilities discussed in the Registration Statement/Prospectus; and (iv) had amassed, and was continuing to amass an aging accounts receivable base, a material portion of which would never be collected." Pl. Resp. at 120.[12] In other words, plaintiffs contend that Deloitte knew about misrepresentations in USN's financial statements because Deloitte knew about problems in USN's operational systems. All of plaintiffs' evidence goes to establishing that Deloitte knew about problems in USN's operational systems. Even if this knowledge could be established, it would merely support an inference of negligence. Plaintiffs offer no evidence that Deloitte actually concluded at the time of its 1997 audit that the operational problems would cause material inaccuracies in USN's financial statements. In fact, Berliner, plaintiffs' expert, testified that he "saw nothing to indicate that anyone from Deloitte made intentional misstatements." Def. Reply, Ex. I at 181.

---

[12]Plaintiffs contend that Deloitte's solicitation of non-audit business from USN raised questions about Deloitte's independence at the time of its audit report. Pl. 56.1(b)(3) at 18. This contention is unpersuasive. Solicitation of non-audit business does not compromise auditor independence. See Edenfield v. Fane, 507 U.S. 761, 771 (1993) (there are no studies that suggest that personal solicitation of prospective business clients by certified public accountants creates the "dangers of fraud, overreaching, or compromised independence . . ."). See also Accounting Series Release ("ASR") No. 264 "Scope of Services by Independent Accountants" (stating that there are no strict rules limiting accountants' ability to conduct non-audit services because these non-audit services typically constitute a small portion of accountants' fees and investors have access to information regarding the relationship auditors have with businesses).

Plaintiffs rely, in part, on a Deloitte report entitled USN Communications, Inc. Revenue Assurance Review in which Deloitte listed USN operational deficiencies and referred to them as risks to the accuracy of the financial statements. Pl. App. Ex. 228. This report gives no indication that Deloitte thought these deficiencies created a risk of *material* inaccuracies. *Id.* Moreover, this report was prepared by Deloitte in 1998. *Id.* Plaintiffs offer no evidence to establish that Deloitte considered USN operational deficiencies to be risks to the material accuracy of the financial reports when it conducted its 1997 audit. In fact, Deloitte sent a letter to USN's audit committee on March 9, 1998 stating that Deloitte believed problems with USN's operational systems had no material effect on USN's financial statements. Pl. App. Ex. 250. The fact that Deloitte conducted independent tests of USN's operational systems rather than relying on USN's internal controls lends credence to its belief. Def. App. Ex. 10 pp. 23-24. Deloitte's belief is further supported by the fact there is no evidence USN's substantial net losses were materially misstated in USN's financial report. Plaintiffs, however, argue that more than the bottom line matters. They cite Statement of Financial Accounting Concepts, stating: "The individual items, subtotals, or other parts of a financial statement may often be more useful than the aggregate to those who make investment, credit and similar decisions . . ." Pl. Resp. at 97. According to plaintiffs, "Any investor considering an investment in USN would recognize that USN would necessarily have substantial losses. The issue was whether, once USN ramped up its customer base, it could achieve substantial revenues and profitability." *Id.* Although it may be true that investors look at more than the bottom line, this argument does not address whether Deloitte thought investors would find data other than the bottom line material to their investment decisions. Deloitte's intention is the relevant consideration, not the accuracy of its conclusion.

16

*Recklessness*

Plaintiffs have not presented sufficient evidence for a reasonable jury to conclude that Deloitte acted recklessly when conducting its 1997 audit. To meet the recklessness standard for auditors, plaintiffs must produce evidence that "the accounting firm practices amounted to no audit at all, or to an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts." Chu v. Sabratek Corp., 100 F. Supp. 2d 815, 823-24 (N.D. Ill. 2000). Merely establishing GAAP violations does not prove Deloitte acted with scienter. *Id.* at 838. In considering whether auditors acted recklessly, courts consider (1) the magnitude of the accounting error; (2) whether defendants had prior notice of the error; and (3) whether defendants were responsible for calculating and disseminating the financial data. *Id.*

To support a claim of recklessness, plaintiffs offer evidence Deloitte was aware of numerous USN operational deficiencies, mainly concerning customer billing.[13] Plaintiffs claim all these operational deficiencies show Deloitte was reckless in conducting its audit of USN's financial statements. Pl. Resp. 119-123. They argue Deloitte should have realized these operational deficiencies would cause USN to overstate incoming revenue. *Id.*

There is evidence, however, that Deloitte took steps to ensure the accuracy of the financial reports despite USN's operational deficiencies. In fact, plaintiffs' expert, Berliner, testified that Deloitte spent 1200 hours on the 1997 audit, and he acknowledged that this was a great deal of time. Def. Resp. Ex. I at 361. This alone defeats a claim of recklessness. This is not a case where Deloitte simply ignored operational deficiencies. Deloitte used sampling techniques to contact people and

---

[13] See Footnote 8.

verify that they were really USN customers. Pl. 56.1(b)(3)(A) at ¶48. Deloitte also used these techniques to determine whether any billing disputes existed between USN and its customers. *Id.* Plaintiffs argue Deloitte should have focused on the existence of the billed receivables rather than simply the existence of the customer. Pl. Resp. at 102. They also contend Deloitte should have focused on unbilled receivables rather than simply billed receivables. *Id.* From these observations, Berliner concluded Deloitte recklessly departed from professional standards. Def. App. Ex. 19 at 7–9. The evidence does not support Berliner's conclusion. Viewed in a light most favorable to plaintiffs, the evidence might support a negligence claim, but it could not convince a reasonable jury that Deloitte's behavior was reckless.

During the 1997 audit, Deloitte proposed to increase USN's allowance for doubtful accounts by $2 million. Pl. 56.1(b)(3)(A) at ¶53. Berliner concluded that Deloitte was deficient in increasing the allowance. Def. App. Ex. 19 at 3. Berliner further opined that the sensitivity analysis Deloitte conducted to determine whether a going concern paragraph should be included in the audit report was inadequate. *Id.* at 4. However, Berliner conceded that he would not have included a going concern paragraph if he had performed the audit. Def. Reply, Ex. I at 185-187. As Deloitte points out, "Procedures that lead to the right conclusion are not reckless." Def. Reply at 12. Again, plaintiffs' evidence supports negligence at most, not reckless behavior. The record shows Deloitte took steps to ensure that the financial statements were materially accurate. Furthermore, Deloitte's expert, LeGrand Kirby, testified that the financial statements were prepared in accordance with GAAP and GAAS. Def. App. Ex. 23 at 3-4. When qualified experts disagree on whether GAAP and GAAS procedures were properly followed, the accounting procedures cannot be deemed reckless. S.E.C. v. Price Waterhouse, 797 F.Supp. 1217, 1241 (S.D.N.Y. 1992).

### Circumstantial Evidence

Even without direct evidence of scienter, plaintiffs may withstand a summary judgment motion if there is circumstantial evidence to support a reasonable inference of the requisite intent. Alra Laboratories, Inc., 1999 WL 160710, at *8. In considering circumstantial evidence, courts focus on whether defendants would benefit from the fraud. Courts ask, "Did they gain by bilking the buyers of securities?" Robin v. Arthur Young & Company 915 F.2d 1120, 1126 (7th Cir. 1990).

Plaintiffs claim Deloitte knowingly risked its reputation "in order to eliminate the risk that USN would terminate the lucrative consulting projects." Cmplt. ¶ 204. Deloitte collected $2 million dollars from USN for its consulting and revenue assurance work that began in 1996. Pl. App. Ex. 114. Furthermore, Deloitte received over $50 million in fees from USN underwriters in 1997. Pl. App. Ex. 8. Although this appears to be a lucrative business dealing, this amount of money, even coupled with similar future earnings, falls vastly below the potential loss of income and good will that Deloitte would sustain if its reputation were damaged by fraudulent business practices. It is not reasonable to infer that Deloitte would be willing to risk its accounting reputation for the sake of USN, one of its many clients. As the court in Robin pointed out, "An accounting firm's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees [for an accounting firm receives for its services] . . . could not approach the losses [the firm] . . . would suffer from a perception that it would muffle a client's fraud." Id. at 1127-28. Therefore, a reasonable jury could not infer that a well-established accounting firm would be willing to take the enormous risk of engaging in fraud for the sake of a lucrative client. See Goldberg v. Household Bank, F.S.B., 890 F.2d 95, 967 (7th Cir. 1989) (citations omitted) ("a plaintiff who imputes to a defendant actions that 'make no economic sense' needs solid proof to survive a motion for summary judgment"). Furthermore, the fees paid to

an accounting firm cannot, as a matter of law, provide sufficient support for Rule 10(b)(5)'s scienter requirement. <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 629 (7th Cir. 1990).

There is insufficient direct and circumstantial evidence of fraud to raise an issue of material fact as to Deloitte's liability under Rule 10(b)(5). The purpose of summary judgment is to eliminate cases in which one side has no realistic chance of prevailing on the merits. This is not a case where the facts viewed in a light most favorable to plaintiffs clearly suggest fraud. Summary judgment is appropriate when the inferences offered to prove fraud establish negligence at best. "Securities litigation is expensive to the parties in money, and to the court in time; it should be brought to a conclusion at the first opportunity." <u>Goldberg v. Household Bank, F.S.B.</u>, 890 F.2d 965, 967 (7th Cir. 1989).

## **CONCLUSION**

The motion for summary judgment is granted.

ENTER:

Suzanne B. Conlon
United States District Judge

November 7, 2000

20